MICHAEL J. HADDAD (State Bar No. 189114)
JULIA SHERWIN  (State Bar No. 189268)
HADDAD & SHERWIN
505 Seventeenth Street
Oakland, California  94612
Telephone: (510) 452-5500
Facsimile:   (510) 452-5510

Attorneys for Plaintiff MARIA
SALGADO DELA TORRE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

MARIA IRMA DELA TORRE
DECEASED, THROUGH HER
SUCCESSOR IN INTEREST, JOSE
MAXIMILIANO LICEA ABACA; MARIA
DELA TORRE,  Individually; and
JOSE MAXIMILIANO LICEA ABACA,
Individually,

              Plaintiffs,

vs.

CITY OF SALINAS, a public entity,
CITY OF SALINAS POLICE CHIEF
DANIEL ORTEGA in his individual and
official capacities, POLICE OFFICER
STEVEN MATTOCKS, Individually,
POLICE OFFICER ROBERT
BALAORO, Individually, and DOES 1
through 10, Jointly and Severally,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No: C 09-00626 RMW (PVT)

Hon. Ronald M. Whyte

**PLAINTIFF MARIA SALGADO
DELA TORRE'S TRIAL BRIEF**

Trial Date: November 8, 2010

## STATEMENT OF FACTS

This tragic case involves the Defendant Salinas police officers' gross mishandling of an obviously "5150" disabled woman, resulting in the police shooting her to death. At the time of her death, Maria Irma Dela Torre ("Irma") was a 45-year-old monolingual, Spanish-speaking woman who had lived in the same home in Salinas for years. She became a United States Citizen in January 2001.

Irma had a lifelong seizure disorder, for which she had received medical treatment for years. Her seizure disorder caused her to behave irrationally at times, and her family would have to call for an ambulance to take Irma to the hospital during these episodes. However, despite her disabilities, Irma was a loving daughter, sister and aunt, and an integral part of her large family.

Irma's mother, Maria Salgado Dela Torre, has been a Lawful Permanent Resident of the United States since May 1999. She spends part of the year in Mexico, where she cares for some of her disabled adult children. Then she spends several months a year with the rest of her family in the United States.

Irma's brother Alfonso, who is also a United States citizen, lives in Watsonville and was very close to his sister. When Mrs. Dela Torre is in the United States, she lives with Alfonso and his family in Watsonville. Mrs. Dela Torre has her own room in the family home in Watsonville. Mrs. Dela Torre travels between Mexico and the United States a few times a year, and when she comes to this country she stays for up to six months at a time.

Numerous family members and Mr. Abarca have testified that when Mrs. Dela Torre was in Mexico, Irma called her every week, and sent her money every month, usually $200 each time.

Irma was well known in her family for her excellent crochet skills. She made numerous beautiful and intricately crocheted items over the years, and often gave them as gifts to her mother and siblings. Her family will testify that she often wore a crochet hook behind her right ear so it would be handy for her to use. (Abarca dep. at 132).

On July 13, 2008, Irma had a seizure and her new husband, Jose Licea Abarca, called Irma's sister, Hilda Hernandez, to help. Hilda came to Irma's house to take her to the hospital. However, when the two women got into Hilda's van, Irma kept trying to get out of the van. Hilda left the van and went to ask Irma's next door neighbor, Maria Monreal, for help, at which point Irma locked herself in the van.

Mrs. Monreal went to speak to Irma to try to get her to come out of the van. Irma refused to come out of the van, saying that she was leaving because her father was waiting for her. (Monreal dep. at 22-23).[1] Irma's sister Hilda then asked Mrs. Monreal to call for an ambulance to take Irma to the hospital. (Monreal dep. at 25-26). Both women, who only speak Spanish, explained the situation to the 911 operator in Spanish and requested an ambulance. They then waited outside for the ambulance to arrive.

Instead of an ambulance, Defendant Salinas police officers Steven Mattocks and Robert Balaoro arrived on the scene.

In April 2009, Salinas hired its new police chief Louis Fetherolf. Chief Fetherolf's first 90-day report to the community noted that "While over 50% of the people in the City speak Spanish as their primary language, less than 25% of all sworn personnel can communicate in Spanish. **Lack of effective verbal communication is a serious**

_____

[1] Irma was close with both of her parents. Her father had just died some days before this incident.

**problem, which impairs our ability to adequately serve a large portion of the community."** (7/21/09 Fetherol 90-day report, p. 34, emphasis added). [2]

      Both Defendant officers testified that about 20% of the people they contact in Salinas speak only Spanish. (Balaoro dep. at 44; Mattocks dep. at 50-51). Mattocks speaks no Spanish whatsoever. Despite the fact that his inability to speak Spanish interferes with his ability to do his job, and he thinks it would be good to learn Spanish, neither Mattocks nor the Salinas Police Department ever sought Spanish language training for Salinas police officers. Indeed, by the time of his November 2009 deposition in this matter, the Salinas police department still had never offered Spanish training to Defendant Mattocks. (Mattocks dep. at 49-51).[3]

      Balaoro similarly cannot communicate with 20% of the people he encounters in Salinas, and his inability to speak Spanish interferes with his ability to do his job.[4] (Balaoro dep. 86).

      These two monolingual English-speaking Defendant officers arrived on a scene full of monolingual Spanish speakers. They did not request an interpreter. Instead, Mattocks spoke very briefly to Mrs. Monreal's 9-year-old son, Alejandro, in English. Mrs. Monreal

---

[2] According to the United States Census Bureau, 72% of Salinas residents are Hispanic or Latino. As of the 2000 census, 55% of Salinas residents spoke Spanish at home, and 34% of Salinas residents spoke English less than "very well." Yet, the City of Salinas does not require its police officers to be able to communicate with the community they serve.

[3] By the time of his May 12, 2010, deposition, Salinas Police Chief Louis Fetherol still had not instituted any Spanish language requirements for police officers. Instead, he began offering 24 hours of voluntary Spanish language training in 2010, and only 9 officers – 5% of the force -- signed up for the training. Chief Fetherol has no plan to offer more than the 24 hours of remedial Spanish language training to his officers, and has no idea how many Spanish interpreters work any given shift, or even how many Spanish interpreters the Salinas Police Department even has. (Fetherol Dep. at 18-19, 22, 35-36).

[4] Balaoro had 2 years of high school Spanish but is not proficient in the language.

asked her son in Spanish to tell the officers in English that Irma was sick and in the van acting crazy, and needed to go to the hospital. (Monreal dep. at 32-33).

Defendant Mattocks went to look inside the van, and saw Irma poking herself in the neck with a safety pin. He thought that Irma had a mental health problem and that she needed to be taken into protective custody pursuant to Cal. Welf. & Inst. Code § 5150. At that point, the Defendant officers' job was to get Irma to a medical facility safely so she could receive the medical help she needed. (Mattocks dep. at 59; Balaoro dep. at 49).

Defendant Mattocks called the dispatcher and said that this was "just a '5150' inside of a van" trying to stab herself in the neck with a pen.[5] (Mattocks dep. at 61; Balaoro dep. at 79, 84-85).

**Fifteen Seconds between the "5150" radio call and Shooting Death of Irma Dela Torre.**

After Mattocks made the "5150" radio call, Irma moved from the van's driver's seat to the passenger seat and back to the driver's seat. Balaoro saw Irma try to start the van's ignition with a penny. (Balaoro dep. at 119-120).

Without ever trying to communicate with Irma, Balaoro decided at that time, and told Mattocks, that if Irma opened the van door he was going to Tase her. (Balaoro dep. 120-121, 79-80). However, Matttocks testified that he never heard Balaoro's plan to Tase Irma, although he did see the red laser light of Balaoro's Taser moving around inside the van. (Mattocks dep. pp. 70-71).

---

[5] Mattocks' radio call refered to a "pen." Later, Mattocks and Balaoro said she had been poking herself in the neck with a small safety pin. Despite the Salinas P.D. combing the minivan for evidence after the shooting, the alleged safety pin was never found. The Coroner's photographs show the tiny puncture wound on Irma's neck.

Balaoro ordered Irma to get out of the van. Irma complied, stepped out of the passenger side door of the van and walked toward Balaoro, who was standing toward the rear of the van.

Balaoro asserts that he yelled to Mattocks, "she has something sharp," but Mattocks denies hearing that. (Balaoro dep. at 96; Mattocks dep. at 72-73). Simply hearing another officer say "gun" or "weapon" or "knife" is no justification for using deadly force. Officers must make their own independent judgments based on the facts of the situation. (Balaoro dep. 60).

The only sharp instrument Mattocks ever saw in Irma's hand while she was in the van was the safety pin. (Mattocks dep. at 128). Mattocks asserts that he came around the front of the van to the passenger side when Irma got out of it, and saw her advancing toward Balaoro with either an ice pick or a knife in her raised right hand. (Mattocks dep. at 76). Balaoro Tased Irma after she exited the van. Then, although he was in a crossfire situation as he faced Officer Balaoro, Mattocks shot Irma twice in the back, killing her.[6]

**The "CAD" (computer aided dispatch) printout of this incidents shows that Mattocks killed Irma less than 15 seconds after he made the "5150" radio call.**

Salinas Police Officer William Gaston was already at the scene and walked up a few seconds after the shooting. He found a 5" long silver crochet hook – the kind Irma wore behind her ear – on the ground near Irma's body. (Balaoro dep. at 33-34).

---

[6] It is well recognized in law enforcement that an officer armed with a firearm may erroneously shoot his gun in response to hearing a Taser fired, in what is called "sympathetic fire response." Officers are now trained that they should say "Taser Taser Taser!" before deploying a Taser, to reduce the likelihood of another officer firing his handgun in sympathetic fire response. According to Plaintiff's police practices expert, Balaoro's decision to Tase this nonviolent emotionally disturbed woman as soon as she exited the van violated generally accepted police standards to begin with. As a factual matter, it may have contributed to Mattocks' shooting of Irma.

Balaoro testified that if his Taser had not worked on Irma, he simply would have retreated and gotten out of her way. (Balaoro dep. 112-113).

**Significantly, Balaoro admitted that *he* never had any justification for using deadly force, and based on what he could see, deadly force was not justified.** (Balaoro dep. 112-113). Officer Balaoro was "surprised" when Officer Mattocks shot Irma. He "didn't expect it." (Balaoro Dep. 144-145).

Deadly force is not justified even in response to someone coming at an officer with a crochet hook. (Balaoro dep. 113). Indeed, there is not one reported case in any state or federal court in this country holding that a crochet hook is a deadly weapon.

The jury will see that these officers' assertion that Irma was about to attack Defendant Balaoro with a crochet hook is a story they concocted after the fact to justify this blatantly unlawful shooting.

Salinas police officers Candy Apple, who photographed the body, and William Gaston, who found the crochet hook, testified that they arrived almost immediately after the shooting, and Irma's body as depicted in Apple's photograph (which will be a trial exhibit) was not moved from the time they arrived.

Plaintiffs' crime scene investigator, David Balash, will testify that the photograph undisputably shows that Mattocks and/or Balaoro moved Irma's body before other officers arrived to secure the scene and photograph the body.

Defendants' proferred crime scene expert, Alexander Jason, agrees that Irma's body was moved before it was photographed; although he speculates that either Irma moved herself or emergency medical personnel moved her. (Jason dep. pp. 131-133). The jury can conclude that Mattocks and/or Balaoro moved Irma's body to look for some possible weapon to justify this unlawful shooting after the fact.

Officer Mattocks strained his own credibility further when he testified in his deposition that he actually saw the crochet hook in Irma's right hand as she lay bleeding on the ground, and he kicked it out of her hand. Yet Mattocks failed to mention this seemingly important fact to his own department and the District Attorney, repeatedly telling them in his videotaped statement that he only saw the crochet hook on the ground next to Irma.

### **Where Was Officer Mattocks Standing?**

Mattocks' claimed justification for shooting Irma based on his perceptions from a location at the front passenger side of the minivan is also contradicted by two other officers as well as eyewitnesses. If Mattocks was not standing where he claims to have been standing when he shot Irma, then his whole story falls apart. Yet, Officer Gaston, who was already at the scene and walked up to the back of the minivan within seconds of the shooting, testified that he saw Mattocks standing at the opposite corner of the minivan (rear driver's side) than where Mattocks now claims he was. Officer Brian Canaday, one of the first officers to arrive after the shooting, testified he asked Mattocks where he was standing when he fired his gun and Mattocks showed him the spot at the *rear driver's side* of the minivan – not at the front passenger side as Mattocks now claims. Eyewitnesses Nancy Urrutia and Dai Solis Garcia also place Mattocks at the rear driver's side of the minivan.

### **Eyewitnesses Testify that Irma Was No Threat.**

*Five* **eyewitnesses** have testified that Irma had nothing in her hands when Mattocks shot her in the back. She was simply walking toward the back of the van after Balaoro's orders that she exit the van.

Eyewitness Maria Monreal testified that Irma's hands were empty and at her sides when she got out of the van and took about four steps toward the back of the van, and then Defendant Mattocks shot her. Irma never attacked or threatened either officer, and never raised her hand up near her head or her shoulder before she was shot. (Monreal dep. at 38, 46, 47).

Mrs. Monreal's husband, Dai Solis Garcia, also saw nothing in Irma's hands before Mattocks shot her. (Solis Garcia dep. at 23). Mrs. Monreal's 9-year-old son, Alejandro Salinas, also witnessed this shooting. Alejandro also testified that Irma had nothing in her hands at the time she was shot. (Alejandro Salinas dep. at 23).

Irma's husband Jose Licea Abarca, who also witnessed the shooting, testified consistently with these eyewitnesses -- Irma had nothing in her hands and they were at her sides, she took about four steps then she was shot. (Abarca dep. at 132, 165).

Defendants' star witness, Nancy Urrutia, testified at her deposition that she did not see anything in Irma's hand, she had just "assumed" there was something there. (Urrutia dep. at 46). She told the police in two earlier statements (one recorded) that she did not see the shooting.

There can be no dispute that the shooting of Maria Irma Dela Torre was a tragic mistake, since she was a law abiding, disabled woman needing medical care, who was either empty handed or at most was holding a harmless crochet hook.

Officer Mattocks claims he mistook this situation for a severe and immediate threat requiring him to shoot Irma in the back. Yet, Defendants' police practices expert, Don Cameron, testified that if it were apparent that Officer Balaoro was able to tactically retreat from harm's way, then deadly force to protect him was not justified. Officer Balaoro testified that he was always able to retreat from harm's way. (Balaoro, 115-116). Officer

Balaoro also testified he never saw Irma Dela Torre as a deadly force threat, he was never justified in using deadly force against her, and he was surprised when Mattocks shot her. (Balaoro dep. 112-113, 144-145).

**Patterns of Poor Judgment and Carelessness.**

Officer Mattock's next shooting less than six months later reveals a disturbing pattern and his poor training. On February 3, 2009, Officer Mattocks again mistook something harmless (this time, a wallet) for a weapon and started shooting. As in the Dela Torre shooting, Mattocks fired despite being in a crossfire situation with his partner. Fortunately, no one was shot in that incident. Former Salinas police officer Swanson, who is being criminally charged in that shooting, will testify at his trial that that shooting was precipitated by Officer Mattocks, and that he essentially is being held responsible for Mattocks' pattern of poor judgment and poor training.

Officer Balaoro's sustained misconduct history is also troubling, including two incidents where he accidentally discharged firearms, and another where he violated direct orders not to contact an informant who was represented by counsel. Even at his deposition, Officer Balaoro characterized the incident with the informant as a mere misunderstanding, when his department had found him to have knowingly violated clear orders, and disciplined him accordingly.

**Violation of POST Standards for Handling Emotionally Disturbed Persons.**

Roger Clark, Plaintiffs' police practices expert, is highly critical of the poor police tactics in this case. All police officers in California are trained by the Commission on Peace Officer Standards and Training (POST) in their basic police academies on how to approach people who are emotionally disturbed or mentally ill and need to be taken to the hospital under Cal. Welf. & Inst. Code 5150.

Officers are trained to move slowly, assume a quiet and nonthreatening manner, take time to assess the situation, give the person time to calm down, and provide reassurance that the officer is there to help. (Plaintiffs' Trial Exhibit, POST Learning Domain 37, pp. 4-12 to 4-13). Officers are trained to talk with the person in an attempt to determine what is bothering them, allow time for the person to consider questions and repeat them if necessary, and not threaten the person in any manner. Id. Communication is key. Id.

Obviously, meeting the standard of care for dealing with a mentally ill or emotionally disturbed person requires the officer to be able to communicate with the person, and to allow the person time to calm down. In this case, Spanish-speaking officers were on the way to the scene after Mattocks' "5150" radio call. Yet, Balaoro decided he would Tase Irma if she got out of the van (before she posed a threat to anyone), and the Defendants gave her 15 seconds after the 5150 call before she was killed.

Clearly, both officers failed to use generally accepted tactics when dealing with Irma Dela Torre, whom they decided was "5150." They failed to communicate appropriately with her; neither officer could communicate with Irma or anyone else at the scene in Spanish, despite both officers' estimation that 20% of the people they contact speak only Spanish; they failed to coordinate their actions as they each did not know what the other was planning and doing; they failed to use time to their benefit; they failed to keep Irma contained in the van where they admit she presented no threat to them or others; and they placed themselves in a situation that Officer Mattocks mistakenly perceived as calling for deadly force.

## LEGAL ISSUES

**1.**     **Fourth Amendment Excessive and/or Deadly Force**

"[Deadly] force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses **_a significant threat of death or serious physical injury_** to the officer or others." Tennessee v. Garner, 471 U.S. 1, 3 (1985) (emphasis added). The threat facing the officer must be **_"immediate."_** 471 U.S. at 11. "[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001).

"Moreover, whenever practicable, a warning must be given before deadly force is employed." Harris v. Roderick, 126 F.3d 1189, 1201 (9th Cir. 1997), cert. den. 522 U.S. 1115 (1998).

Under the Fourth Amendment, police may only use such force as is objectively reasonable under the circumstances. Graham v. Connor, 490 U.S. 386, 397 (1989). "The essence of the Graham objective reasonableness analysis is that the _force_ which was applied must be balanced against the _need_ for that force: it is _the need for force_ which is at the _heart_ of the Graham factors." Headwaters Forest Defense v. County of Humboldt (Headwaters II), 276 F.3d 1125, 1130 (9th Cir. 2002) (emphasis in original).

Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 398. "The most important single element of the three specified factors" is "whether the suspect poses an immediate threat to the safety of the officers or others." Smith v. City of Hemet, 394

F.3d 689, 702 (9th Cir. 2005) (en banc). [7]

Less intrusive alternatives to the force that was used must be considered as a part of the "totality of the circumstances." Smith v. City of Hemet, 394 F.3d at 701 (*en banc*). The Ninth Circuit has repeatedly concluded, **"Thus, where there is no need for force, *any* force used is constitutionally unreasonable."** Lolli v. County of Orange, 351 F.3d 410, 417 & n. 5 (9th Cir. 2003).

The Ninth Circuit has repeatedly stated that a person's mental illness or incapacity is an important factor militating against the use of force by officers:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. See *Alexander [v. City and County of S.F., 29 F.3d 1355, 1366 (9th Cir. 1994)]* (holding that the police used excessive force, considering all the circumstances, in "storming the house of a man whom they knew to be a mentally ill ... recluse who had threatened to shoot anybody who entered"). Even when an emotionally disturbed individual is "acting   out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual. We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals. Instead, we emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under Graham, the reasonableness of the force employed.

---

[7] Still, "[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001).

Deorle, 272 F.3d at 1282-1283 (footnotes omitted); Drummond v. City of Anaheim, 343 F.3d 1052, 1057-58 (9th Cir. 2004), cert. denied, 542 U.S. 918 (2004) (decedent's mental disability must be taken into account in the reasonableness inquiry).

Particularly apt here, where officers shot Irma within 15 seconds after deciding she was 5150, is the Ninth Circuit's admonition: "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." Deorle, 272 F.3d at 1281.

2. **First and Fourteenth Amendment Claim for Loss of Familial Association**

This Court has held that both Plaintiffs present claims for violation of their rights to familial associations under the First and Fourteenth Amendments. (Doc. 83, pp. 6-8). Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991); Lee v. City of Los Angeles, 250 F.3d 668, 685-686 (9th Cir. 2001).

The Ninth Circuit recently fleshed out the liability standard that applies to this claim in Porter v. Osborn, 546 F.3d 1131, 1132 (9th Cir. 2008):

> This case raises the question of the appropriate standard of culpability to apply to a police officer who kills a suspect in the course of investigating a suspicious car parked alongside an Alaska highway, under circumstances that suggest the officer may have helped to create an emergency situation by his own excessive actions. It comes in the context of a lawsuit brought by the parents of the victim, claiming the officer violated their *Fourteenth Amendment* substantive due process right of familial association with their deceased son.

The officer in Porter helped create an emergency situation by his own excessive actions. Id. The officer in Porter fired shots to protect his partner, who he mistakenly believed was threatened. 546 F.3d 1135. The partner of the officer who shot the decedent in Porter later expressed "shock" that shots were fired when he did not believe deadly force was justified. Id.

Similarly in the present case, Officers Mattocks and Balaoro helped create an

emergency situation when they violated their POST training for how to handle an

emotionally disturbed person, failing to coordinate their actions, failing to attempt to

communicate with Irma, increasing the tension of the situation by yelling at her, drawing

their guns, and aiming a Taser with a laser sight at her, failing to give her time to calm

down, and failing to keep her contained where she and they were safe.  Instead,

Defendant Balaoro ordered Irma to get out of the minivan, and when she complied and he

Tased her as he had told Mattocks he was going to do, Balaoro was "surprised" to learn

that Mattocks had shot her.  As in <u>Porter</u>, Balaoro also did not believe deadly force was

justified to protect him.

The <u>Porter</u> Court found that the due process liability standard of "shocks the

conscience" is satisfied where the jury finds the officer "acted with a purpose to harm that

was unrelated to legitimate law enforcement objectives."  <u>Porter v. Osborn</u>, 546 F.3d 1131,

1136 (9th Cir. 2008).[8]  "More specifically, '[i]t is **the intent to inflict force beyond that**

**which is required by a legitimate law enforcement objective** that 'shocks the

conscience' and gives rise to liability under § 1983 . . . .'"  <u>Porter</u>, 546 F.3d at 1140, <u>citing</u>,

<u>Davis v. Township of Hillside</u>, 190 F.3d 167, 172 (3d Cir. 1999) (emphasis added).

Furthermore, **"facts suggesting that [the officer's] own conduct created and**

**agitated this escalating situation and that his reactions were disproportionate to the**

**situation he faced," including expert testimony, are relevant to show a purpose to**

**harm unrelated to legitimate law enforcement objectives.**  <u>Porter</u>, at 1140, 1142.

For this claim, Mrs. Dela Torre is entitled to damages for emotional distress and

---

[8] In the Ninth Circuit, the plaintiff does not have to show intent or purpose to harm the relationship – or even knowledge of the relationship – just that the officer used conscience shocking force against the decedent.  <u>Ward v. City of San Jose</u>, 967 F.2d 280, 283-284 (9th Cir. 1991).

1  punitive damages generally available for an individual § 1983 claim.[9]

2  **3.  Under § 1983, Officers Are Liable for Their Own Acts, the Acts of Others**
3  **that They Set in Motion, And Violations of Rights Done with Their**
   **Integral Participation.**

4  Under longstanding precedent, an officer is liable not only for violations of rights that

5

6  he caused by his own conduct, but also violations of rights by others that he set in motion,

7  where he reasonably should have known his conduct would cause others to inflict the

8  constitutional injury.  Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978).  The Ninth

9  Circuit explains:

10         Section 1983 provides, in pertinent part, that "(e)very person who,
11     under color of any statute of any state . . ., subjects, or causes to be
       subjected, any citizen of the United States or other person within the
12     jurisdiction thereof to the deprivation of any rights, privileges, or immunities
       secured by the Constitution and laws, shall be liable to the party injured . . .."
13     (42 U.S.C. §1983.)  A person "subjects" another to the deprivation of a
       constitutional right, within the meaning of section 1983, if he does an
14     affirmative act, participates in another's affirmative acts, or omits to perform
       an act which he is legally required to do that causes the deprivation of which
15     complaint is made.  (Sims v. Adams (5th Cir. 1976) 537 F.2d 829.)  Moreover,
       personal participation is not the only predicate for section 1983 liability.
16     Anyone who 'causes' any citizen to be subjected to a constitutional
       deprivation is also liable.  The requisite causal connection can be established
17     not only by some kind of direct personal participation in the deprivation, but
       also by **setting in motion a series of acts by others which the actor**
18     **knows or reasonably should know would cause others to inflict the**
       **constitutional injury.**
19

20  Id (emphasis added); Harris v. Roderick, 126 F.3d 1189, 1196 (9th Cir. 1997), cert. denied
21

22  522 U.S. 1115 (1998) **(officers are liable for shooting by different officer where their**

23  **exaggeration of threat led to shooting)**.  Therefore, where Defendant Balaoro opened

24  ─────────────────
    [9] Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307 (1986), quoting Gertz v. Robert
25  Welch, Inc., 418 U.S. 323, 350 (1974) (in a §1983 action "compensatory damages may include ...
    such injuries as impairment of reputation ..., personal humiliation, and mental anguish and
26  suffering"); Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991) (loss of companionship
    and society); Ward v. City of San Jose, 967 F.2d 280 (9th Cir. 2002) (punitive damages for parents
27  in police shooting case); Bloch v. Sheriff L. John Ribar, 156 F.3d 673, 679 (6th Cir. 1998)
    (emotional distress; see also cases cited therein); Parrish v. Johnson, 800 F.2d 600, 606-607 (6th
28  Cir. 1986) (same).

the door of the minivan and ordered Irma Dela Torre to get out, planning to Tase her before she had posed a threat to anyone, the jury can find that he set in motion the events that seconds later led Officer Mattocks to shoot Irma Dela Torre.

Both officers also can be held liable for Irma's death based on their integral participation in these events that led to a violation of her rights. Blankenhorn v. City of Orange, 485 F.3d 463, 481, n.12 (9th Cir. 2007). The Ninth Circuit has held that:

> An officer's liability under section 1983 is predicated on his "integral participation" in the alleged violation. Chuman v. Wright, 76 F.3d 292, 294-95 (9th Cir. 1996). "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation" Boyd [v. Benton County], 374 F.3d [773, 780 (9th Cir. 2004)]. But it does require some **fundamental involvement in the conduct that allegedly caused the violation**. See id. (holding that every officer who provided armed backup for another officer who unconstitutionally deployed a flash-bang device to gain entry to a suspect's home could be held liable for that use of excessive force because "every other officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flashbang was to be deployed").

Id (emphasis added).

Similarly, in Jones v. Williams, the Ninth Circuit affirmed a defense verdict in a §1983 case in which the district judge gave the following "concurrent cause" instruction to address allegations of supervisory and group liability: "[M]any factors or things or the conduct of two or more persons can operate at the same time either independently or together to cause injury or damage and in such a case each may be a proximate cause." Jones v. Williams, 297 F.3d 930, 937 n.7 (9th Cir.2002).

Thus, under the "totality of the circumstances," the jury can find that both officers "set in motion" and were "integral participants" in the violation of Irma Dela Torre's rights. For this assessment, all of the officers' conduct leading up to the shooting must be considered under the totality of the circumstances.

### 4. Maria Dela Torre Has Standing to Bring Her Personal Claims for Loss of Familial Association (First and Fourteenth Amendments) and for Wrongful Death (Fourth Amendment, Battery, and Negligence)

#### A. Standing to Bring Familial Association Claim

This Court denied Defendants' motion for summary judgment concerning standing to bring the familial association claim, concluding:

> Assuming Maria had been a longtime legal permanent resident of the United States and had not been absent from the United States for prolonged periods of time, the applicability of the First and Fourteenth Amendments to the police officers' conduct, which occurred in California, should not turn on the fortuitous circumstance of whether Maria happened to be physically present in the United States at the time her daughter was shot.

(Doc. 83, p. 5).

Due to some unclarity in the record (largely due to Mrs. Dela Torre's lack of education, sophistication, and language skills), this Court found "genuine issues of material fact regarding whether Maria was a legal permanent resident of the United States at the time her daughter, Irma, was killed and whether she had been absent from the United States for prolonged periods of time." (Doc. 83, p. 6). Mrs. Dela Torre's Lawful Permanent Resident (LPR) cards are genuine and will be supported with testimony from Mrs. Dela Torre as well as her family members attesting to her LPR status.

Concerning time absent from the United States, this Court also noted that in other cases four months away did not affect an LPR's standing to assert Constitutional rights while nineteen months away did. (Doc. 83, p. 4, n. 1, *citing* Shaughnessy v. United States, 345 U.S. 206, 213-14 (1953)). The United States government informs LPR's "A general guide used is whether you have been absent from the United States for more than a year." (Plaintiffs' Trial Exhibit). It is undisputed that Plaintiff has not been absent from the United States for more than a year. The United States government has never challenged or raised any objection to Plaintiff's LPR status at any time.

The only time Plaintiff was ever cautioned about the length of her time spent outside the United States was in June 2001, when the customs official noted, "Out 11 months, advised of Res. Req." (Plaintiff dep. p. 101). No immigration official has ever raised an issue with Plaintiff staying outside the United States too long, other than that single incident over nine years ago. (Id.). Plaintiff shows her Permanent Resident card – not her passport – to enter the United States, and as far as Plaintiff can recall, no immigration official keeps a record of her entry when she shows her Permanent Resident card at the port of entry. (Plaintiff dep. p. 106).

This Court will be able to resolve these underlying issues of material fact from the full trial record.

This Court rejected Defendants' argument that a Lawful Permanent Resident must be physically present in this country at the exact moment her rights are violated here – or in this case, at the moment officers shot her U.S. citizen daughter in California. (Doc. 83, pp. 3-5). The Verdugo-Urquidez [10] plurality emphasized the location of the search at issue in that case happening in Mexico: "We do not think the applicability of the *Fourth Amendment* to the search of premises in Mexico should turn on the fortuitous circumstance of whether the custodian of its nonresident alien owner had or had not transported him to the United States at the time the search was made." 494 U.S. at 272. Justice Kennedy, the fifth vote for the Court's holding that the Fourth Amendment did not apply in that situation, went even further, writing, "If the search had occurred in a residence within the United States, I have little doubt that the full protections of the *Fourth Amendment* would apply." 494 U.S. at 278. For these reasons, the Ninth Circuit has

---

[10] United States v. Verdugo-Urquidez, 494 U.S. 259 (1990).

similarly limited the holding of <u>Verdugo-Urquidez</u> to *extraterritorial* searches. *See* <u>United States v. Davis</u>, 905 F.2d 245, 251 (9th Cir. 1990), <u>cert. denied</u>, 498 U.S. 1047 (1991).

Justice Kennedy's statement that the location of the alleged Fourth Amendment violation was completely dispositive, together with the opinions of the remaining four justices that the Fourth Amendment applied even to Mr. Verdugo-Urquidez, a Mexican citizen brought here against his will, constitute a majority for the proposition that the Fourth Amendment would apply to a search on U.S. soil affecting a non-resident alien regardless of any ties to this country, or lack thereof. Thus, <u>Verdugo-Urquidez</u> supports Maria Dela Torre's standing to assert a claim for violation of her right to familial association where that right was violated by officers killing her daughter in the United States. [11]

Assuming Mrs. Dela Torre needs to show that she is "a longtime legal permanent resident of the United States and had not been absent from the United States for prolonged periods of time," (Doc. 83, p. 5), this Court found questions of fact to be resolved from a full trial record. These questions of fact underlying Plaintiff's standing must be resolved by this Court, because standing is always a question of law for the court. *See,* <u>Estate of Amos v. City of Page</u>, 257 F.3d 1086, 1093 (9th Cir. 2001) ("standing is a question of law"); *see also,* <u>Armstrong v. Davis</u>, 275 F.3d 849, 860-861 (9th Cir. 2001) (Ninth Circuit affirmed district court's ruling on standing that included factual findings made by the court from the trial record).

---

[11] ***It would also seem illogical and unjust to deny standing to a Lawful Permanent Resident who happens to be visiting in Mexico at the moment Salinas officers kill her U.S. citizen daughter in California, while everyone agrees that an undocumented alien who happens to be in the United States when his wife is shot here undisputably does have standing.***

**B.     Standing to Bring Wrongful Death Claims**

It is well-established that as long as Plaintiff Maria Dela Torre meets the statutory standing requirements to bring a wrongful death claim under California law, her citizenship, residency, or presence in the United States are irrelevant to her standing.  The only requirements for standing under California Code of Civil Procedure § 377.60 are those set forth in that statute.  Rosales v. Battle, 113 Cal.App.4th 1178, 7 Cal.Rptr.3d 13 (Cal. App. 2003) (non-resident aliens living outside United States would have standing to bring wrongful death claims if they otherwise meet the statutory requirements of CCP § 377.60).

Maria Dela Torre has standing to bring her claims as a dependent parent under C.C.P. § 377.60.[12]  All that is required in order to show that Maria Dela Torre was "dependent on the decedent" is that Mrs. Dela Torre "rel[ied], *to some extent*, on the financial support" of her daughter, Irma.  Chavez v. Carpenter, 91 Cal.App.4th 1433, 1445-1446, 111 Cal.Rptr.2d 534 (2001) (emphasis in original).  *See also,* Perry v. Medina, 192 Cal.App.3d 603, 610, 237 Cal.Rptr. 532 (1987) (**support of $50-$100 per month was sufficient for standing as dependent parent**).

The uncontradicted evidence (including testimony and receipts) shows that Irma gave her mother approximately $200 per month almost every month, going back for years. She also sent clothes and other items of support to her mother while she was in Mexico. Maria Dela Torre used this money for her own basic needs whether she was in the United States or Mexico, and to support herself and her household in Mexico while she was there helping to care for her disabled adult children.

---

[12]     "A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons…:

\*          \*          \*

(b) Whether or not qualified under subdivision (a), if they were dependent on the decedent, the … parents."   § 377.60.

The <u>Chavez</u> Court further explained what "some extent" of support is:

> It appears from this record that appellants received "financial support from their child which *aid[ed] them* in obtaining . . . shelter, clothing, food . . . ." (*Perry v. Medina, supra, 192 Cal. App. 3d at p. 610,* italics added.) There is evidence that appellants routinely relied on decedent for money to defray their ordinary living expenses, and for help with their cars, land, and business. The reasonable inference from that evidence is that appellants relied on decedent's aid--at least to some extent--for life's necessities.

<u>Chavez</u>, 91 Cal.App.4th 1447-1448.  Finding material issues of fact sufficient to confer standing, the California Court of Appeal decided that the appellants' standing therefore should not have been summarily adjudicated.

As under federal law, standing is not to be resolved by a jury.  "Standing is a question of law."  <u>IBM Personal Pension Plan v. City and County of San Francisco</u>, 131 Cal. App. 4th 1291, 1299; 32 Cal. Rptr. 3d 656, 661 (Cal. App. 2005).  Whether or not a person has standing can require interpretation of facts in light of statutory intent, as a court can do:

> Generally, "[a] litigant's standing to sue is a threshold issue to be resolved before the matter can be reached on the merits. [Citation.]" (*Blumhorst v. Jewish Family Services of Los Angeles (2005) 126 Cal.App.4th 993, 1000 [24 Cal. Rptr. 3d 474].*) Because standing goes to the existence of a cause of action, lack of standing may be raised by demurrer or at any time in the proceeding, including at trial or in an appeal. (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 862, p. 320; *Blumhorst v. Jewish Family Services of Los Angeles, supra, 126 Cal.App.4th at p. 1000.*) Standing requirements vary from statute to statute, **and must be assessed in light of intent of the statute at issue**. (5 Witkin, *supra*, § 862, p. 320; *Blumhorst, supra, at p. 1000.*)

<u>Buckland v. Threshhold Enterprised, LTD</u>, 155 Cal. App. 4th 798, 814; 66 Cal. Rptr. 3d 543, 554 (Cal. App. 2007) (bold emphasis added).

The <u>Perry</u> Court found that the legislative intent behind including dependent parents within the class of persons who can sue for wrongful death was "to remedy the type of situation the court found in <u>Evans [v. Shanklin</u>, 16 Cal.App.2d 358, 60 P.2d 554 (Cal. App.

1936)]."  In <u>Evans</u>, before the dependent parent amendment to the Wrongful Death Act,

the court reluctantly held that an aged mother who was dependent on her married son

could not bring a wrongful death claim for his death.  <u>Id</u>.  Thus, California courts recognize

the legislative intent to provide a wrongful death remedy for a dependent parent in Maria

Dela Torre's position.

Therefore, as with the determination of standing for the familial association claim, it

is the duty of this Court to resolve Maria Dela Torre's standing to bring a wrongful death

claim as a dependent parent based on the factual record developed at trial, the

requirements of CCP § 377.60(b) as interpreted by case law, and "assessed in light of

intent" of that statute.

### 5.  Plaintiffs' Wrongful Death Claims Properly Include Violation of Irma Dela Torre's Fourth Amendment Right to Be Free from Unreasonable Deadly Force

While § 1983 does not specifically address who has standing to bring an action for

the death of another or what damages are recoverable in such an action, § 1988 (a)[13] sets

forth a three-step analysis for determining those issues:

"First, courts are to look to the laws of the United States 'so far as such laws
are suitable to carry [the civil and criminal statutes] into effect.'  [42 U.S.C. §
1988.]  If no suitable federal rule exists, courts undertake the second step by

[13] 42 U.S.C. § 1988 (a) provides:

"(a) Applicability of statutory and common law. The jurisdiction in civil and criminal
matters conferred on the district and circuit courts [district courts] by the provisions of
this Title, and of Title "CIVIL RIGHTS," and of Title "CRIMES," for the protection of all
persons in the United States in their civil rights, and for their vindication, shall be
exercised and enforced in conformity with the laws of the United States, so far as such
laws are suitable to carry the same into effect; but in all cases where they are not
adapted to the object, or are deficient in the provisions necessary to furnish suitable
remedies and punish offenses against law, the common law, as modified and changed
by the constitution and statutes of the State wherein the court having jurisdiction of such
civil or criminal cause is held, so far as the same is not inconsistent with the Constitution
and laws of the United States, shall be extended to and govern the said courts in the trial
and disposition of the cause, and, if it is of a criminal nature, in the infliction of
punishment on the party found guilty."

considering application of state 'common law, as modified and changed by the constitution and statutes' of the forum State. A third step asserts the predominance of the federal interest: courts are to apply state law only if it is not 'inconsistent with the Constitution and laws of the United States.'"

<u>Golden State Transit Corp. v. City of Los Angeles</u>, 773 F.Supp. 204, 208 (C.D. Cal. 1991),

<u>quoting</u> <u>Burnett v. Grattan</u>, 468 U.S. 42, 47-48, 104 S. Ct. 2924 (1984).

Or, as the Supreme Court explained, **"This means, as we read § 1988, that both federal and state rules on damages may be utilized, whichever better serves the policies expressed in the federal statutes."** <u>Sullivan v. Little Hunting Park, Inc.</u>, 396 U.S. 229, 240 (1969) (emphasis added).

The policies behind § 1983, which is derived from the Civil Rights Act of 1866, are simple: "The basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." <u>Carey v. Piphus</u>, 435 U.S. 247, 254 (1977). "Deterrence of future egregious conduct" is also "a primary purpose of §1983." <u>Smith v. Wade</u>, 461 U.S. 30, 49 (1983). Section 1983's "unique remedy makes it appropriate to accord the statute a sweep as broad as its language." <u>Wilson v. Garcia</u>, 471 U.S. 261, 272 (1985).

The High Court has further explained,

> Where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.
>
> *   *   *
>
> The existence of a statutory right implies the existence of all necessary and appropriate remedies.

<u>Sullivan</u>, 396 U.S. at 239.

**A. The Ninth Circuit, Northern District, and California Courts Have Repeatedly Held that Where a Person Has Been Killed By Police Excessive Force, a § 1983 Fourth Amendment Claim Can Be Brought Pursuant to Both Wrongful Death and Survival Statutes**

California provides a wrongful death claim for certain persons, including dependent parents, "for the death of a person caused by the wrongful act or neglect of another." Here, the wrongful act of the Defendants was their violation of Irma Dela Torre's Fourth Amendment right to be free from unreasonable deadly force. The Plaintiffs' right to a statutory wrongful death claim (with statutorily enumerated damages) for Defendants' "wrongful act" causing Irma's death is created by state statute: C.C.P. § 377.60. As in any wrongful death case, the "wrongful act" is done to the decedent, not to the Plaintiff, and is a violation of the decedent's rights.

The wrongful death damages allowed under C.C.P. § 377.60 include recovery for loss of love, companionship, comfort, affection, society, solace or moral support, and any loss of enjoyment of sexual relations, as well as all financial losses suffered by the survivors, including loss of financial support and services provided by the decedent. The survivors' grief and sorrow is not compensable. California Approved Jury Instructions (CACI), 3921; Krouse v. Graham, 19 Cal.3d 59, 137 Cal.Rptr. 863 (1977).

California and Ninth Circuit Courts have repeatedly held that survivors of a decedent who otherwise meet the requirements to bring state wrongful death or survival claims are entitled to bring Fourth Amendment claims for violation of the decedent's rights that caused death.

For example, in Alvarez v. Wiley, 71 Cal.App.3d 599, 139 Cal.Rptr. 550 (1977), the California Court of Appeal found that in § 1983 cases, Congress intended "to adopt as federal law the forum state's law on survival of claims for wrongful death." 71 Cal.App.3d at 604. Thus, in a § 1983 case brought in state court, an heir is entitled to wrongful death

damages pursuant to C.C.P. § 377 [the predecessor statute, now amended at § 377.60].
71 Cal.App.3d at 605.

Similarly, in Garcia v. Superior Court, 42 Cal. App. 4th 177; 49 Cal. Rptr. 2d 580 (1996), the state court declined to follow federal cases providing for conscious pain and suffering and loss of life, because it concluded damages available for a federal civil rights claim in California – both survival *and* wrongful death – were adequate: "In determining whether California law is consistent with the federal Civil Rights Act, it is appropriate to consider the state provisions not only for survival of decedent's action but also for the survivors' wrongful death action." 42 Cal. App. 4th at 187.[14]

Plaintiff's Fourth Amendment wrongful death claim survives the death of the decedent. The Ninth Circuit explained in Sposato v. Electronic Data Systems, 188 F.3d 1146, 1149 (9th Cir. 1999), "California enacted a [sic] comprehensive survival statutes for personal tort and wrongful death actions." The Court stated that this comprehensive system provides for both limited "survival" damages and more substantial "wrongful death" damages, citing Garcia, 42 Cal. App. 4th 177 (1996), discussed above. Id.

The Ninth Circuit and Northern District courts also have found wrongful death damages available to heirs of a decedent in § 1983 Fourth Amendment death cases. *See,* Moreland v. Las Vegas Metropolitan Police Department, 159 F.3d 365, 370 (9th Cir. 1998) (Fourth Amendment claims for death can be brought pursuant to C.C.P. § 377.60 by "any of a defined list of persons that includes a decedent's spouse, children or heirs"). *See also*, Guyton v. Phillips, 532 F.Supp. 1154, 1167 (N.D. Cal. 1981) ("Under California law, a wrongful death action may be brought" in 4th Amendment police shooting case); Davis v.

---

[14] The portion of that opinion rejecting compensation for pain and suffering and loss of life was criticized in Garcia v.Whitehead, 961 F.Supp. 230, 233 (C.D. Cal. 1997).

City of Ellensburg, 651 F.Supp. 1248, 1257 (E.D. Wash. 1987) (allowing wrongful death claim in § 1983 action); Galindo v. Brownell, 255 F. Supp. 930 (S.D. Cal. 1966) (wrongful death damages "necessary to render the Civil Rights Act fully effective"); Venerable v. City of Sacramento, 185 F. Supp. 2d 1128, 1133 (E.D. Cal. 2002) (considering damages "provided by the California survival and wrongful death statutes, the court finds that state law is not inconsistent" with federal law); Foster v. City of Fresno, 392 F. Supp. 2d 1140, 1145-1146 (E.D. Cal. 2005) (California wrongful death statute permits § 1983 claims for violation of decedent's Fourth Amendment rights causing death), following, Moreland, supra; and Teran v. County of Monterey, 2009 U.S. Dist. LEXIS 42639 at 16-17 (N.D. Cal. May 20, 2009) (Judge Ware held that if parent could prove dependence, she could bring CCP § 377.60 wrongful death claim asserting decedent's Fourth Amendment rights).

Both Byrd v. Guess, 137 F.3d 1126 (9th Cir. 1998) and Moreland, supra, held that wrongful death claims properly made under C.C.P. § 377.60 *do* survive in a Fourth Amendment action. However, in both cases, the plaintiffs either failed to properly plead their representative status for Nevada's survival statute (Moreland, 159 F.3d at 370), or had waived any claim for wrongful death before trial (Byrd, 137 F.3d at 1130).[15] In the present case, both Plaintiffs are appropriate wrongful death claimants under §377.60.

Because the plaintiffs in Byrd and Moreland had failed to comply with the enabling state statutes for survival/wrongful death claims under the Fourth Amendment, they could only bring direct Fourteenth Amendment claims. Thus, those Courts concluded that only a Fourteenth Amendment liability standard could apply for those claims. Fourth Amendment claims were not at issue.

---

[15] Similarly, in Smith v. Fontana, 818 F.2d 1411, 1417 (9th Cir. 1987), the plaintiffs did not plead wrongful death claims pursuant to C.C.P. § 377.60.

Some courts conflate the concept of actions *that survive* the death of the person whose rights were violated, with the name given in California to one type of such action, a "survival action."  However, both "wrongful death" claims and "survival" claims, when properly made under California law, survive in a civil rights death case.  *See, e.g.* Sposato v. Electronic Data Systems, 188 F.3d 1146, 1149 (9th Cir. 1999) (California has enacted "comprehensive survival statutes for personal tort and wrongful death actions").  Thus, in Byrd, the Ninth Circuit Court wrote, **"It is also undisputed that California law applies to this case, and permits survival actions to be brought by the personal representative of the estate of the deceased or by the deceased's successors in interest. *See Cal.Civ.Proc.Code § 377.60* (1996)."**  Byrd, 137 F.3d at 1131 (emphasis added).  That statute, C.C.P. § 377.60, is California's wrongful death statute.

Similarly, in Moreland, the Ninth Circuit distinguished Nevada's more limited survival claim statutes from California's C.C.P. 377.60 (wrongful death), which the Court held "authoriz[es] causes of action to be brought by decedent's personal representative 'or' any of a defined list of persons that includes a decedent's spouse, children, or heirs."  159 F.3d at 370.

In Crumpton v. Gates, 947 F.2d 1418, 1421, n. 1 (9th Cir. 1991), where the Ninth Circuit was discussing its previous holding in Smith v. Fontana, supra, which did not permit a decedent's children to maintain their father's Fourth Amendment cause of action for the alleged use of excessive force by police that caused his death *where those children had not invoked California's wrongful death statute*, the Court wrote an important footnote:

> **Although we did not mention it in Fontana, we believe that the text of section 1983 itself may be read to allow for the bringing of such suits by proper third parties.** While § 1983 speaks of a "person" subjecting a "citizen . . . or other person" to a deprivation of civil rights, it specifically makes a remedy available to "the party injured." Although we could read "the party injured" merely as a shorthand reference to the civil rights victims who

could be *either* citizens or persons, **we believe that the better reading, consonant with the legislative history, is that Congress intended by this provision to allow survivors to sue for *their harm* stemming from the deprivation of *a loved one's civil rights*. *See* Steinglass, <u>Wrongful Death Actions and Section 1983</u>, 60 Ind. L.J. 559, 644-54 (1985).**

<u>Crumpton</u>, <u>supra</u>, (emphasis added).

Defendants continue to assert qualified immunity as a defense in the present action while disputing Plaintiffs' right to bring a wrongful death claim for violation of Irma's Fourth Amendment rights. The Ninth Circuit has held that unpublished opinions may be cited to inform qualified immunity analysis of whether a right has been clearly established. <u>Sorrels v. McKee</u>, 290 F.3d 965, 971 (9th Cir. 2002). In an unpublished case, the Ninth Circuit directly addressed this issue, dispelling any doubt that clearly established law allows a plaintiff to assert a decedent's Fourth Amendment rights in the context of a wrongful death claim under CCP § 377.60:

> Preliminarily, we address the question of standing. Although the district court relied upon this court's holding in *Byrd v. Guess, 137 F.3d 1126 (9th Cir. 1998)*, to find that Little's surviving spouse and children lacked standing to assert his *Fourth Amendment* rights, *Byrd* itself relied upon a prior version of the state law, which did not permit survival actions. Because *California Civil Procedure Code § 377.60* (effective May 23, 1997) authorizes such actions, decedent's wife and children have standing to assert Little's *Fourth Amendment* rights. *See Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 369 (9th Cir. 1998).* Decedent's mother, however, does not have standing to assert his *Fourth Amendment* rights because she has failed to meet her statutory burden of demonstrating that she was dependent on Little. *Cal.Civ.Proc.Code § 377.60(b)*; *see Moreland, 159 F.3d at 369.* All appellants have standing to sue under the *Fourteenth Amendment. See Moreland, 159 F.3d at 371.*

<u>Little v. City of Manhattan Beach</u>, 21 Fed. Appx. 651, 652 (9th Cir. 1991).

Plaintiffs' properly assert claims for violation of Irma Dela Torre's Fourth Amendment rights pursuant to California's wrongful death statute, CCP 377.60.

Dated:  October 7, 2010                              HADDAD & SHERWIN

                                                     _____
                                                     Michael J. Haddad
                                                     Attorneys for Plaintiff Maria
                                                          Salgado Dela Torre